### MARTIN v. METROPOLITAN LIFE INS. CO.
### METROPOLITAN LIFE INS. CO. v. MARTIN.

No. 13404.

United States Court of Appeals Fifth Circuit.

Oct. 26, 1951.

Hugh M. Dorsey, Jr., Madison Richardson, Atlanta, Ga., for appellant.

Alex W. Smith, Atlanta, Ga., for appellee.

Before SIBLEY, RUSSELL, and RIVES, Circuit Judges.

SIBLEY, Circuit Judge.

The appellant, Mrs. Sarah Martin, formerly Mrs. Billingslea, sued Metropolitan Life Insurance Company as beneficiary on a policy of insurance on the life of her former husband Louis T. Billingslea for $5,000.00, exhibiting the policy, and Billingslea's application therefor which by Georgia law is a part of the policy, and alleging that it was issued March 17, 1947, and a year's premium was paid by Billingslea at the time of issuance; and that Billingslea died July 5, 1947; and that she had made due proofs of death, but the Company had refused payment. The Company's answer, as amended, admitted these facts, but denied liability except for the return of the premium which had been tendered and refused, on the ground that Billingslea had died of carcinoma of the kidney found to exist as early as March 12, 1947. It was further pleaded that in the exhibited application signed by him on March 6, 1947, Billingslea had been asked, "What physicians, healers or other practitioners, if any, not named above, have you consulted or been treated by, within the past five years? If none, so state." and he answered, "None"; which was a materially false representation, in that he had since November 24, 1944, been frequently treated by a Dr. Bancker for chronic bronchitis and colds, and Dr. Bancker had on January 6, 1947, sent him to Dr. Pittman who treated him for prostatitis and urethral stricture from January 8 till shortly before the death; and that on March 6, 1947 he consulted Dr. Bancker about a dull pain under his shoulder blade which had existed for a month. At this time Dr. Bancker noticed several small nodules or tumors under the skin, and directed Mr. Billingslea to consult Dr. Stewart about them. Billingslea consulted Dr. Stewart on March 12, and on March 14 Dr. Stewart reported to Dr. Bancker that there was a large tumor five by five inches in diameter on the right kidney, and in his opinion the small nodules were metastases from it, and that Billingslea's condition was cancerous and hopeless. The answer alleged these things were all concealed from the Company and not discovered by it till disclosed in Mrs. Billingslea's proof of death; when it avoided the policy and tendered back the premium. During the trial before a jury the Company struck out its allegation of wilfulness in the concealment and the plaintiff abandoned her claim that attorneys' fees were recoverable for bad faith in the defense. On the remaining issue whether there was a material concealment which affected the risk and invalidated the insurance, the Court directed a verdict for

the defendant. The correctness of that ruling is the controlling question on this appeal.

It is conceded that though the policy was issued at the Company's home office in New York, it was applied for and delivered in Georgia and is governed by Georgia law. That law is the general law as modified by statute. There are several sections of the Georgia Code which have frequently been construed and applied by the Court of Appeals and by the Court of last resort, the Supreme Court of Georgia. The Code references to actual fraud and wilful concealment are not directly applicable, nor are cases on that question. The Supreme Court discussed the Code sections and reviewed many of the cases on innocent concealment and misrepresentation recently in Vaughn v. National Life & Accident Insurance Company, 189 Ga. 121, 5 S.E.2d 238, and in Preston v. National Life & Accident Insurance Company, 196 Ga. 217, 26 S.E.2d 439, 148 A.L.R. 897. Our Court more recently in Mutual Benefit Health & Accident Association v. McCranie, 5 Cir., 178 F.2d 745, 747, after quoting the Georgia Statutes and reviewing some of the Georgia cases, said "The appellate courts of Georgia have held in an unbroken line that a material misrepresentation as to a known fact will avoid a policy if such misrepresentation changes the character or extent or nature of the risk." In that case the misstatement was in answer to a question in the application, as here, but had nothing to do with the cause of the death. What makes the misrepresentation material is not that the thing misstated caused or contributed to the death, but that it affected the *risk*, and probably influenced the insurer's acceptance of the risk.

What are the clear facts here? Billingslea, on January 30, 1947, signed in Atlanta, Georgia, Part A of the application to the Company which stated, among other things, "It is understood and agreed that (1) The foregoing statements and answers are correct and wholly true and together with the answers to questions in Part B hereof" (not executed till March 6, 1947) "shall form the basis of the contract of insurance if one be issued. * * * (4) The Company shall incur no liability under this application until it has been received, approved and a policy issued and delivered and the full first premium specified in the policy has been paid to and accepted by the Company during the life-time and continued insurability of the applicant." The importance of this quotation is that it shows that Billingslea since January 30, 1947, was aware that he was to answer the questions and submit to the medical examination provided in Part B; that his answers were to be the basis of the contract; and that in fact no contract was made till the policy was issued on March 17, 1947, and the premium paid and the policy delivered in Atlanta some days later.

Dr. Bancker testifies without contradiction that Billingslea had been under his treatment since November 24, 1944 for chronic bronchitis, having at that time choking spells, expectorating a cupful of mucus and having fallen unconscious to the floor. He was treated again for colds in January, 1945 and in December, 1945 for inflamed spots on his ankle with pain and swelling. He took injections of 20,000 units of penicillin. In April, 1945 Dr. Bancker treated him for running of the nose and eyes and sneezing, and he was given 40,000 units of penicillin, repeating the treatment on April 27. On April 29, penicillin morning and afternoon and a sulfa drug were administered. On May 1, there was more penicillin and sulfa. His bronchitis was improved, but still troubling him. On May 22, 1946 he returned for treatment and had more penicillin and vitamins. In October, 1946 he got cold tablets and, on October 14, he returned with an exacerbation of his bronchitis and received 300,000 units of penicillin in oil and by injection. On January 4, 1947 his complaint was frequent night urination and inability to urinate freely, and Dr. Bancker gave him a prescription for vitamins and a cold vaccine and referred him to a specialist, Dr. Pittman, about the urinary troubles. He came back January 13, 1947, having had a chill and with fresh cold, and got sulfa tablets and stomach tablets for

indigestion, and had a swelling of feet and ankles which had been present for 4 days. The doctor thought the swelling was due to citrus fruit juice. His bronchitis was acute at that time. He came again January 20, his ankles still swollen and bronchitis bothering him a great deal. On January 24, January 30, and February 4, he took injections of cold vaccine. He next saw Dr. Bancker March 6, 1947. His chief complaint was "a sharp and dull pain at the angle of the left shoulder blade which had been present for one month." His chest was normal except for occasional rattles of chronic bronchitis. The doctor testifies, "He had also four tumors on the back of his chest, varying in size from a pea to a dime, and one on the front of the abdomen and one under each breast. For these lipoma, I referred him to Dr. Calvin Stewart for examinations and biopsy examination, it being Dr. Stewart's specialty. This was between 12:30 and 1 o'clock on March 6." On cross examination Dr. Bancker said he thought the tumors were probably harmless and did not suggest any urgency in going to see Dr. Stewart. "I simply suggested that he drop by and let Dr. Stewart look and cut it out and put it under the microscope and settle it." Billingslea did not go till March 12 to Dr. Stewart. He testifies that besides the small tumors he at once discovered a large one, larger than an average grapefruit, in the abdomen on the right kidney, and concluded that it was malignant, the smaller ones being metastases from it, showing widespread and deepseated cancerous trouble which was nonoperable, and that death was a matter not of years but of months; and that the condition had existed for several months. On March 14 he so wrote Dr. Bancker and also told Dr. Pittman; but did not tell Mr. Billingslea he had cancer. Thinking X-ray treatments might give temporary improvement, he gave them from March 12 through May 23, when he went on vacation and another doctor continued them. The death in July was certified by him as due to carcinoma of the kidney.

Meanwhile Dr. Pittman, the urinary specialist, treated Billingslea nine times for prostatitis and stricture at the usual intervals of about two weeks, by massage and dilation, from January 8, 1947 into June. He testifies that these are rather common troubles in men and usually curable, but if not treated promptly and properly might cause serious injury to the kidneys. He said he would express no opinion about Billingslea's general condition, preferring that Dr. Bancker answer about that, but that if he had known all the facts he would have thought a more thorough examination was due. Dr. Bancker would not say that the things he treated him for were all trivial, but that no one was serious, that bronchitis does not kill, but it does weaken one's resistance to other things, and did make Billingslea's colds worse and harder to treat. He also did not tell Billingslea that he had cancer, and did not think he had cancer till Dr. Stewart wrote him on March 14.

On this evidence Billingslea's unequivocal answer to the question as to what physicians he had consulted or been treated by in the last five years, "None", was palpably untrue. Treatments by Dr. Bancker and Dr. Pittman were then going on and had been for weeks and months and, on the very date of the answer, just before or just after it, he was advised to consult Dr. Stewart. Instead of the man of perfect health in recent years that his answer represented him to be, he had frequented doctors' offices. He and they may not have thought his many ailments serious, but the Company had the right to judge of that, and to pursue the enquiry before taking the risk. The ailments were not mere colds and cut fingers which were cured and perhaps forgotten, but things then under treatment and the truth of the answer was expressly agreed to be the basis of the contract which Billingslea was proposing to the Company. There is high authority that so long as no contract has been consummated the representations so made in the application for insurance are continuing and, if the applicant learns while his application is under consideration that his representations have become untrue, he is under duty to give the true information to the Company. Stipcich v. Metropolitan Life Insurance Company, 277 U.S. 311,

48 S.Ct. 512, 72 L.Ed. 895. Billingslea, on the very day he answered "None", was sent to consult Dr. Stewart and was by him diagnosed and treated on March 12, five days before the Company accepted his proposal. At that time he was utterly uninsurable, and all three of his doctors knew it, though there is no proof he did. Any enquiry by the Company among the doctors, had they been truly named, would have disclosed the tragic truth. The evidence however is not clear as to the exact hour he was sent to Dr. Stewart, and as to how much he knew about Dr. Stewart being a cancer specialist, and X-ray being a treatment for cancer, so we rest our affirmance of the direction of the verdict rather on the clear falsity of the answer touching the other doctors and their treatments, holding that the concealment, though not a wilful fraud, was material to the risk, and justifies avoiding the contract as a matter of law.

Mrs. Martin, on the testimony of the Company's medical examiner who, on March 6 took down Billingslea's answers to Part B of the application, contends that the Company had authorized or ratified incomplete answers in many medical examinations, and in this very case, where Billingslea had disclosed in answer to more specific questions that he had in 1929 had an eye removed and an artificial eye put in and now wore glasses and in 1929 had influenza and was sick three days, and in 1937 had a sore throat two days, he did not state and the examiner had not written down the doctors' names and other details. So that on its face complete answers were not sought but were waived and could not, after issuing the policy, be insisted on. This may be true as to the incomplete answers criticised, but the examiner testifies that they were all old occurrences, whose consequences were apparent, and the doctors concerned perhaps dead or removed, and the matters now immaterial. As to the question about the last five years, he put down Billingslea's exact answer "None". We think there was no waiver or estoppel as to it. It was clear, full, and emphatic, but false.

After Mrs. Martin took her appeal, the Metropolitan Life Insurance Company filed a notice reciting that fact and that it "hereby takes a cross appeal to the U. S. Court of Appeals of the Fifth Circuit complaining of various rulings against it in the trial of said case." The errors afterwards specified relate to exclusions of evidence intended to show that Billingslea was told by Dr. Bancker to see Dr. Stewart just before Billingslea went before the medical examiner. By a joint stipulation the record of evidence and proceedings was made up to cover both appeals. In this court the Company stoutly and successfully maintained that there should be no new trial, but an affirmance. If there was error in the rulings complained of in the so-called cross appeal its correction could be effective only in a new trial, which has been denied at the instance of the Company. The "cross appeal" now presents nothing for decision, and is dismissed.

Costs of appeal are adjudged against each appellant on his appeal, except that as to the joint record of evidence and proceedings, beginning with page 18 of the printed record, made and printed by stipulation, the cost thereof is to be equally divided between the appellants.

Judgment affirmed.